UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                      Case No. 20-CR-15

MARK A. RUPPELT,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Matthew D. Krueger, United

States Attorney for the Eastern District of Wisconsin, and Gregory J. Haanstad, Assistant United

States Attorney, and the defendant, Mark A. Ruppelt, individually and by attorney Jonathan C.

Smith, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following

plea agreement:

## CHARGES

2.      The defendant has been charged in all three counts of a three-count information,

which alleges violations of Title 18, United States Code, Section 1343.

3.      The defendant has read and fully understands the charges contained in the

information. He fully understands the nature and elements of the crimes with which he has been

charged, and those charges and the terms and conditions of the plea agreement have been fully

explained to him by his attorney.

4.      The defendant voluntarily agrees to waive prosecution by indictment in open

court.

5. The defendant voluntarily agrees to plead guilty to Counts One, Two, and Three of the information, set forth in full in Attachment A.

6. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove beyond a reasonable doubt the facts in Attachment B. The defendant admits that these facts are true and correct and that they establish his guilt beyond a reasonable doubt.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty each carry the following maximum penalties: 20 years' imprisonment; a $250,000 fine; and three years of supervised release. Each count also carries a mandatory special assessment of $100. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 28 of this agreement.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9. The parties understand and agree that in order to sustain the wire fraud charges in each count of the information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant knowingly devised or participated in a scheme to defraud;

2

Second, the defendant did so with intent to defraud;

Third, the scheme involved a materially false or fraudulent pretense or representation; and

Fourth, for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications in the manner charged in the particular count.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The defendant acknowledges and agrees that his attorney has discussed the potentially applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

3

## Sentencing Guidelines Calculations

14.      The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.      The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

16.      The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in the information is seven under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

17.      The parties agree to recommend to the sentencing court that, because the loss associated with the offenses was more than $15,000, a four-level increase to the offense level is applicable under Sentencing Guidelines Manual § 2B1.1(b)(1)(C).

## Abuse of Position of Trust

18.      The parties agree to recommend to the sentencing court that, because the defendant abused a position of private trust, a two-level increase to the offense level is applicable under Sentencing Guidelines Manual § 3B1.3.

4

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.

## Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

### Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

### Restitution

28.     The defendant agrees to pay restitution in the amount of $24,000 at or before the time of sentencing, as ordered by the Court. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

6

## **DEFENDANT'S WAIVER OF RIGHTS**

29.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.     At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

30.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

7

The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

31.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

32.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

33.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statute or Sentencing Guidelines. This waiver does not extend to an

8

appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily

## **Further Civil or Administrative Action**

34.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## **GENERAL MATTERS**

35.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

37.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed.

9

The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

38.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

39.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/16/19

_____
MARK A. RUPPELT
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12/16/19

_____
JONATHAN C. SMITH
Attorney for Defendant

For the United States of America:

Date: 1-24-2020

_____
MATTHEW D. KRUEGER
United States Attorney

Date: 1/24/2020

_____
GREGORY J. HAANSTAD
Assistant United States Attorney

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,                        Case No. 20-CR-15

v.                                                [18 U.S.C. § 1343]

MARK A. RUPPELT,

                Defendant.

---

## INFORMATION

---

### THE UNITED STATES ATTORNEY CHARGES:

1.      Beginning in approximately May of 2014, and continuing until on or about July 7, 2016, in the State and Eastern District of Wisconsin and elsewhere,

### MARK A. RUPPELT,

with intent to defraud, knowingly devised and executed a scheme to defraud Client A and to obtain money by means of materially false and fraudulent pretenses and representations, and knowingly caused wire communications to be transmitted in interstate commerce for the purpose of executing the scheme.

### Background

2.      At all times relevant to this information:

      a.      Mark A. Ruppelt was an attorney licensed to practice law in the State of Wisconsin;

      b.      "Client A" was an inmate in a federal prison serving a sentence after having been convicted on federal drug charges; and

      c.      "AUSA 1" was an Assistant United States Attorney assigned to handle post-conviction litigation in the case against Client A.

## The Scheme to Defraud

3.     The essence of Ruppelt's scheme was to obtain money from Client A by falsely claiming that he had arranged to pay a bribe to a federal judge, a probation officer, and AUSA 1 in exchange for their assistance in obtaining a sentence reduction when, in fact, none of those officials were aware of Ruppelt's representations to Client A and none had offered or agreed to accept a bribe.

4.     As part of the scheme:

a.     In approximately February of 2014, based on a referral from a fellow inmate whom Ruppelt had previously represented, Client A contacted Ruppelt.   Over the next several weeks, Ruppelt and Client A had a number of discussions via email and by phone during which they discussed the possibility of Client A retaining Ruppelt to pursue a sentence reduction.

b.     In one of those conversations, Ruppelt told Client A that he could get around legal impediments to a sentence reduction because Ruppelt was "willing to do things other lawyers are not."

c.     Ruppelt asked for, and Client A paid, an initial $10,000 "retainer" in May 2014.

d.     In September 2014, Ruppelt told Client A that he had spoken with AUSA 1 and a federal probation officer and that, based on those conversations, Client A would have to pay another $10,000 to have his sentence reduced. As a result of Ruppelt's representation, Client A's stepfather mailed Ruppelt another $10,000 check on approximately September 10, 2014.

e.     In a phone conversation on January 15, 2015, Ruppelt told Client A that another $10,000 payment would "100% secure" a sentence reduction. Client A's stepfather mailed that $10,000 payment to Ruppelt.

f.     On May 9, 2015, Ruppelt told Client A that he had already "taken care of" paying the probation officer and only had to pay AUSA 1.

g.     On November 11, 2015, Ruppelt put Client A off by telling him that, because of the political climate, public officials were not likely to accept a bribe at that time.   Ruppelt explained that Hillary Clinton was "under a

2

lot of scrutiny with respect to what happened with the Benghazi stuff and whatnot. . . . There's no one right now that wants to do anything that's gonna jeopardize themselves, which is exactly what would happen if this ever got out."

h.     Also on November 11, 2015, Ruppelt falsely told Client A that he had met with the responsible public officials but that he was "not stupid enough to exchange any money with anybody" or "to put anything in the hands of anybody until I got some assurances"

i.     On February 16, 2016, Ruppelt again put Client A off, telling him that AUSA 1 still planned to accept a bribe, but wanted to wait until the middle of March or early April to do so.

j.     On March 8, 2016, Ruppelt told Client A that the bribery arrangements were in place for the payment to be made a "couple of weeks" down the road, falsely claiming that he had "circled back with [AUSA 1] and I actually think . . . this thing is resurrected and I think we're still a 'go' on this thing.   It may be another couple of weeks yet, but based upon what I have done and who I've talked to, I think we're still in a good place."

k.     On March 28, 2016, Ruppelt told Client A that he would send Client A a bill that would falsely detail the expenditure of $24,000 of the $30,000 retainer Ruppelt had received from Client A and his family.   He also told Client A that he would return the remaining $6,000 for Client A's family to hold until it was needed to complete the bribe to AUSA 1.

l.     On April 26, 2016, when Client A inquired about the status of the bill and check, Ruppelt falsely claimed that he had mailed them to Client A's family and that someone had stolen them from the mail.

m.     On April 29, 2016, after learning that Client A's mother had filed complaints against him with the Wisconsin Department of Justice and the Office of Lawyer Regulation, Ruppelt told Client A to tell his parents that Ruppelt was willing to "work out" what he characterized as essentially a "fee dispute."   Ruppelt told Client A that characterizing their activity as bribery was "not going to do anybody any service" and that Ruppelt did not "want to make matters any worse for any of us."

n.     On May 3, 2016, Ruppelt mailed a check for $6,000 to Client A's parents.

3

5.     To conceal his scheme, Ruppelt directed Client A to avoid "putting anything in writing or whatnot," explaining that "there can't be any trace of this."

6.     As a result of his scheme, Ruppelt fraudulently obtained and attempted to obtain $30,000.

## Execution of the Scheme

7.     On or about the dates listed below, for the purpose of executing his scheme and attempting to do so, Ruppelt caused the following wire communications to be transmitted in interstate commerce, between the Eastern District of Wisconsin and the District of Colorado:

| Count | Date | Description |
|-------|------|-------------|
| 1 | February 16, 2016 | Phone call between Ruppelt and Client A, during which Ruppelt falsely told Client A that AUSA 1 was willing to accept a bribe. |
| 2 | March 8, 2016 | Phone call between Ruppelt and Client A, during which Ruppelt again falsely told Client A that AUSA 1 was willing to accept a bribe, stating "I think we're a 'go' on this thing.   It may be another couple of weeks yet but, based upon what I have done and who I've talked to, I think we're still in a good place." |
| 3 | April 29, 2016 | Phone call between Ruppelt and Client A during which Ruppelt coached Client A not to characterize any of their arrangements as bribes, because doing so would create problems for both of them, particularly for Client A, who was "in an unenviable position as a federal prisoner." |

Each in violation of Title 18, United States Code, Section 1343.

4

**Attachment B**

Mark A. Ruppelt was an attorney licensed to practice in Wisconsin. In 2014, Client A, who at the time was serving a prison sentence for a conviction on federal drug charges, retained Ruppelt in order to pursue a sentence reduction. Ruppelt falsely claimed to Client A that Ruppelt had arranged to pay a bribe to AUSA 1 in exchange for AUSA 1's assistance in obtaining a sentence reduction for Client A. In fact, Ruppelt had no arrangement or conversations with AUSA 1 regarding a potential bribe or exchange for a sentence reduction.

A.     Preliminary conversations between Ruppelt and Client A:  2014 - 2015

In 2014 and 2015, before the government became aware of Ruppelt's scheme, he and Client A had a number of discussions regarding how Client A's sentence could be reduced. One of the avenues they discussed for obtaining a reduction was 18 U.S.C. § 3582(c), which allows the sentencing court to reduce the term of imprisonment for a defendant who was sentenced based on a sentencing range that has subsequently been lowered by the Sentencing Commission. From an early point, Ruppelt and Client A both correctly recognized that, because Client A's sentencing range had been determined under the Guidelines' Career Offender provisions, he was not eligible for a § 3582(c) reduction. Ruppelt assured Client A, however, that he could nonetheless obtain a reduction because Ruppelt was "willing to do things other lawyers are not" – a line that Ruppelt would later repeat during a monitored and recorded conversation with Client A.

Ruppelt told Client A that he would need a $10,000 retainer and, in June 2014, Client A's mother sent Ruppelt a check in that amount. During phone conversations over the next few months (approximately July to September 2014), Ruppelt told Client A he had reached out to an Assistant United States Attorney, whom Ruppelt identified by name ("AUSA 1"). Ruppelt said that, based on his conversations with AUSA 1 and with a probation officer, he needed another $10,000 to get the sentence reduction. Client A had his mother mail another $10,000 check to Ruppelt.

Client A next spoke with Ruppelt on January 15, 2015, when Ruppelt told him that yet another $10,000 payment would "100% secure" a sentence reduction. Client A arranged for his stepfather to pay that third $10,000 payment to Ruppelt.

According to Client A, he initially believed that he was paying Ruppelt a legitimate retainer. He began to understand, though, with Ruppelt's demands for additional money and his use of phrases like "the right financial arrangements," and "willing to do things that other lawyers are not," that Ruppelt was talking about bribing a judge, a federal prosecutor, and/or a probation officer. When that became clear to Client A, he contacted another attorney, who then contacted the FBI.

B.     Recorded calls between Ruppelt and Client A

Between April 25, 2015, and May 17, 2016, working with case agents, Client A made a number of recorded calls from a federal correctional institution outside the Eastern District of Wisconsin, to Ruppelt, who was in the Eastern District of Wisconsin during the calls.

1.    *Recorded call: April 25, 2015*

During some of their phone conversations, Ruppelt and Client A also discussed another inmate who was serving a sentence in the same federal facility as Client A. Client A told Ruppelt that the fellow inmate wanted to hire Ruppelt to obtain a sentence reduction. Client A also told Ruppelt that, like Client A, the fellow inmate had been sentenced under the Career Offender provisions of the sentencing guidelines and therefore appeared not to be eligible for a sentencing reduction under § 3582(c). Ruppelt and Client A discussed Client A's fellow inmate during a recorded call on April 25, 2015:

> **Ruppelt:**     **Give me as much info as you can on your situation, or this possible referral.**

> Client A:     OK. He's a friend, he's now at the exact same situation as me. . . . He's trying to get the two-level, but he's got the Career Offender.

Client A told Ruppelt that, while he had spoken with the fellow inmate, Client A was careful not to "just come out and say 'we're bribing a prosecutor and PO' until I touched base with you to see how much you wanted me to tell him." Ruppelt responded:

> **You know, [Client A], I wouldn't go crazy. I mean, I would just ask for 10 up-front like I normally do. . . . I never like to get too aggressive at the start. I mean, I would just do the 10 like I reflected for you and then . . . if there's a need for something additional depending upon the, quote, 'situation,' that's something I can deal with him directly on then. . . . [J]ust tell him, 'Yeah, I would totally recommend this guy, and he said he's got some ways of getting around the Career Criminal stuff and is willing to do some things that others may not, and he'll only, you know, he'll only ask for 10 up front.'**

2.    *Recorded call: May 9, 2015*

On May 9, 2015, Ruppelt and Client A again had a conversation about paying bribes to obtain sentencing reductions for Client A and his fellow inmate.

> Client A:     I talked to my friend. He's excited. I told him everything you're able to do – that you're able to take care of the PO and prosecutor and make that Career Offender stuff go away. He's excited.

> **Ruppelt:**     **OK. Perfect.**

> Client A:     Last time when we were talking, you said that nothing is guaranteed in your business, but when you had me ask my parents for that last 10 grand to spread the money around to the PO and prosecutor, you said we were 100% guaranteeing my release. Are we still good on that?

2

| Ruppelt: | Yeah. We're . . . where we need to be. I didn't mean to confuse anybody or whatnot, but no. We're right where we need to be, for lack of a better term. |
|---|---|
| Client A: | OK. OK. Everything's good then? I told him, I told him you're gonna go take care of the PO, prosecutor, judge, whatever it took. |
| **Ruppelt:** | **Right.** |
| Client A: | And you already took care of the PO, you just gonna go down there and pay this prosecutor guy and we're good? |
| **Ruppelt:** | **Yep. Exactly. Exactly.** |
| Client A: | Ok. Ok. Now, are you going to need more money or are we good? I mean, everybody is satisfied with their payments? |
| **Ruppelt:** | **I can't specifically say "Yes" for sure. I don't want to say "Yes" to something 100% on the money thing and then, and then come back and say something else, but let me put it to you this way: I'm 95% sure we're fine.** |
| | . . . . |
| Client A: | Oh, before I forget: The dude did have one concern, because we have different judges and he says [the sentencing judge] is kind of a dick, so he don't know if this dude will take a bribe or not, so I don't know if that's something you gotta feel out or if it's even a concern . . . . I didn't know, like, if we even needed to pay the judges or if we were just able to like – Because I know how, like, on a normal thing, usually whatever the prosecutor and the PO says, that's pretty much what happens in court. It doesn't even really matter what the judge thinks. I didn't know if that mattered or not. |
| **Ruppelt:** | **Right, right. It is more just the prosecutor, to be very honest. Once you get past the prosecutor, the judge is gonna stamp this thing.** |
| Client A: | Ok. And that [AUSA 1] dude, he's all good? |
| **Ruppelt:** | **Yep. He's good. He's good to go. Yep.** |

3.    *Recorded call: November 11, 2015*

On November 11, 2015, Client A made another recorded phone call to Ruppelt. During that call, they again discussed paying a bribe to AUSA 1. Ruppelt told Client A that, because of the political climate at the time – particularly, according to Ruppelt, the reluctance of public

3

officials to "jeopardize themselves" at a time of increased scrutiny in the wake of the congressional inquiry into Hillary Clinton "lying and the Benghazi stuff" – public officials were not likely to accept a bribe "at this particular point." Ruppelt told Client A that they would have to wait another "90 days or so" for the political climate to change.

| | |
|---|---|
| **Ruppelt:** | **Obviously you're aware of the shit that's going on on the outside with Hillary Clinton. And I'm not about to get into politics, but obviously she's under a lot of scrutiny with respect to what happened with the Benghazi stuff and whatnot. So there isn't anything that's gonna happen with respect to any type of, you know, sign-off on this thing, um, because there's just way too much at stake.** |
| Client A: | I'm, confused. What does Hillary—what does Hillary Clinton got to do with it? |
| **Ruppelt:** | **You don't—you're not aware of all the hearings that she's undergoing in front of the Senate with respect to lying and the Benghazi stuff? . . . . There's no one right now that wants to do anything that's gonna jeopardize themselves, which is exactly what would happen if this ever got out. . . . I mean it's not something that's gonna happen at this particular point. . . ."** |
| Client A: | I'm a little confused right now. |
| **Ruppelt:** | **. . . . you understand the ramifications that people would be under if this, you know, if this was ever found out by anybody? I mean do you com— do you fully understand that?** |
| Client A: | Um, I mean, kinda. |
| **Ruppelt:** | **Alright. Well I think you're kind of, I think you're kind of making light of what could happen if something like this was done and found out by the wrong people. . . .** |
| Client A: | I don't see what the presidential candidate has to do with me. . . . |
| **Ruppelt:** | **Yeah. Understand that what you are seeking to have done, though, was in essence asking someone to br— you know, commit a bribery, alright? Which in and of itself is a, you know, that's a crime.** |
| Client A: | So what happened to all the money, then? |
| **Ruppelt:** | **Well, I've got it in my trust account. It hasn't gone to anyone. It's not gone. . . .** |

4

| Ruppelt: | I met with these people first, but believe you me, I'm not stupid enough to exchange any money with anybody until I've got, you know, what I would need. . . . |
|---|---|
| Client A: | Okay, see, I was under the impression that we paid these guys already and that now they're backing out of everything. |
| Ruppelt: | I wouldn't be stupid enough to put anything in the hands of anybody until I got some assurances, you know, that what was gonna be done was gonna be done. So please don't be worried about that. |

During that same November 11, 2015, conversation, Ruppelt also emphasized to Client A the importance of concealing the bribe scheme.

| Ruppelt: | And then let me ask you this: the concept of money going to anyone. Has that, was that something that you discussed either with your mom or with your step-dad . . . . You didn't bring that up to them, did you? |
|---|---|
| Client A: | Not to my step-dad, no. But my mom talked about it after you guys had, uh, spoken. |
| Ruppelt: | A little bit? Okay. Okay. Alright. Um, I just didn't know, again I know that certain people know certain things and other people don't and I just wanna make sure that I am clear with respect to who knows what. |
| Client A: | Yeah. |
| Ruppelt: | So I don't wanna, you know, I just don't wanna get, I don't wanna get caught and say something to somebody that, you know, that ends up getting you or me in trouble. So I just wanted to be clear on, you now, on who know what . . . . |
| Ruppelt: | . . . . [M]ake sure that when you talk to your mom, nothing about this can be put, you know– I don't want her putting anything in writing in an email or whatnot. . . . |
| Ruppelt: | . . . . I just don't want her, I don't want her putting anything even to me in any type of email or anything like that. I just, there can't be any written trace of this. |

5

4. *Recorded call: February 16, 2016*

During a February 16, 2016, conversation, Ruppelt reaffirmed that AUSA 1 was interested in taking a bribe but did not want to do so until April 2016:

**Ruppelt:** **[A]t this particular point, [AUSA 1] said that he's not interested or willing to do anything. . . . [H]e asked me to revisit him like mid-March, early April. . . .**

. . . .

Client A: [S]o when I talk to my parents, I'm gonna tell 'em you're looking into this whole thing and just that [AUSA 1] is still kind of onboard to take some money but he doesn't want to do it until April?

**Ruppelt:** **Correct.**

5. *Recorded call: March 8, 2016*

On March 8, 2016, Client A made another recorded phone call to Ruppelt. Ruppelt assured Client A that the scheme to bribe AUSA 1 had been "resurrected."

**Ruppelt:** **. . . . I circled back with [AUSA 1] and I actually think, [Client A], this thing is resurrected and I think we're still a "go" on this thing. It may be another couple of weeks yet but, based upon what I have done and who I've talked to, I think we're still in a good place.**

6. *Recorded call: March 28, 2016*

On March 28, 2016, Client A made another recorded phone call to Ruppelt, who told Client A that there was only $6,000 remaining from the $30,000 "retainer" but assured him that he could "get this done for that amount or less if need be." Ruppelt agreed to send Client A's mom and step-dad the remaining $6,000 (as well as a bill falsely detailing his expenditure of the other $24,000) to hold until it was needed to pay AUSA 1.

Client A: [Y]ou're telling me you don't even have the money to pay this guy now.

**Ruppelt:** **Well, no. I do. . . .**

Client A: $6,000. Are you gonna do it for $6,000?

**Ruppelt:** **I can get this done for that amount or less if need be.**

. . . .

Client A: Okay. Like I said, for his peace of mind go ahead and send I guess the $6,000. He's gonna, like I said, he's gonna be pissed and flip out, but

6

send that to him for now and as soon as you know something's gonna
happen, just hit me up . . . and I'll shoot that back. I don't know if they
[Client A's parents] get that back if they're gonna let me have any more, if
he needs more than that, if [AUSA 1] needs more than $6,000 or
whatever.

. . .

**Ruppelt:** **Yeah, no, I wouldn't, I wouldn't worry about that at all. That's my
issue to deal with and I'm confident that I can deal with that in a way
that wouldn't, I guess, wouldn't require anybody expending any
additional money. Let me just put it that way.**

7.    *Recorded call: April 26, 2016*

On April 26, 2016, Client A made a recorded phone call to Ruppelt and asked about the
status of the bill and check that Ruppelt had said he would send to Client A's mom and stepfather.
Ruppelt made up a story, telling Client A that someone had stolen the check from the mail and
cashed it.

**Client A:** Wondering what's going on.

**Ruppelt:** **Well, I'm not good. I've got a real fucking problem. I mailed out both
bills as well as a check and the check was cashed. So obviously I take
it it wasn't cashed by either your stepdad or your mom, so at this
particular point my bank is filing a fraud complaint and getting a
reversal on the funds so I can send out a new one when the funds are
returned to me. So that's the situation there. I should have clarification
by the end of the week. At least that's what they're telling me. But
obviously I'm just confirming it wasn't anybody on your end that
cashed it, correct?**

**Client A:** No, my parents were wondering where the bill is 'cause you said you were
gonna send a bill, too, and that hasn't made it.

**Ruppelt:** **Well, did you just hear what I said? Obviously it didn't get there.
Somebody fucking took it. Someone took my fucking check and
fucking cashed it, so now I'm out fucking money and have to get it back
into my account, which has been a complete pain in the ass.**

Later in the April 26, 2016, recorded phone conversation, Ruppelt said that he was
continuing to "work with" AUSA 1 and was "attempting to make inroads with him."

8.    *Recorded call: April 29, 2016*

On April 29, 2016, Client A made another recorded phone call to Ruppelt. During the call,
they discussed a complaint that Client A's mother had lodged with Wisconsin's Office of Lawyer

7

Regulation and with two state attorney general's offices. Ruppelt emphasized the importance of characterizing and treating the complaints as simple fee disputes and avoiding any disclosure of their planned bribery.

| | |
|---|---|
| **Ruppelt:** | **Hey, [Client A]. I actually, I talked to your mom last night.** |
| Client A: | Okay. |
| **Ruppelt:** | **So do you know anything about this thing that she . . . filed with the AG's office? Because that could be really dangerous.** |
| Client A: | I'm not real sure. Like I told you, I knew they were gonna be pissed. I mean, you spent $24,000 . . . . |
| **Ruppelt:** | **Yeah. Alright. I'll figure it out. I just don't wanna see something happen that would make matters any worse for you or anyone.** |
| | . . . . |
| **Ruppelt:** | **. . . . I had no idea this was gonna be done. I haven't talked to your mom in quite some time. I guess I just would have wished somebody would have talked to me about it first.** |
| Client A: | I know they said they contacted the AG up in Wisconsin. . . . |
| **Ruppelt:** | **Yeah. Yeah, I talked to your mom. I talked to your mom last night about it.** |
| Client A: | And I think the Office of Lawyer Regulations and somebody else. I'm not too sure who. |
| **Ruppelt:** | **Yeah. I think it was the American Bar Association is what she put in the email, but. . . . what it ends up ultimately being is a fee dispute which most of these agencies aren't gonna get involved in. They're basically gonna, you know, tell you to just try to work it out amongst yourselves. There's programs that they offer, you know, arbitration or fee arbitration. I don't want to, you know, I'm not interested in monkeying around and spending, you know, more time and money doing all of that. I think we can work it out. . . . So just let them know that when you talk to them.** |
| Client A: | Okay. |
| **Ruppelt:** | **. . . . if we work it out, what's been submitted I think can most likely be withdrawn. They're the ones that filed them, and if they end up being, you know, satisfied, we can, you know, we can work it out that way.** |

8

> **But just make sure that they're both aware that I'm willing to do that. And I expressed that to your mom last night, so she's aware of that.**
>
> . . . .
>
> Ruppelt:  **. . . . If something can be worked out that would be the best case scenario and understand that for, you know, for everybody. I just hope they didn't put anything in the complaint about what, you know, what that was all about 'cause that's not something that anybody's gonna want, you know, that's just, I'm . . . .**
>
> . . . .
>
> Client A:  I know what you're saying. Yeah. Can't exactly go around saying you're bribing a bunch of people.
>
> Ruppelt:  **I don't want something to come back to you and somebody starts saying, "Oh, well, you know, [Client A] paid." You know, you're in an unenviable position as a federal prisoner. People, you know, things would be looked at potentially differently in someone's eyes and I just don't want that to happen. Obviously I don't want to make matters any worse for any of us.**
>
> Client A:  . . . . I'm smart enough not to right off the bat say, "Hey, we're trying to make bribes and stuff, so."
>
> Ruppelt:  **Right. No, no. That's not gonna do . . . anybody any service. That's just gonna create many more, you know, people turning heads and wondering, you know, what's going on, et cetera, et cetera. So let's just keep this about, you know, about the money and I think we can work that out. I'm confident we can work that out.**

On May 3, 2016, four days after Client A's mother claimed to have complained to OLR and two state attorney general's offices, Ruppelt mailed her a $6,000 check and a false billing statement purporting to account for the legitimate expenditure of the other $24,000 from Ruppelt's "retainer."

9